UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 04-40023-FDS |
| | ) | |
| JOSE SANTOS BUENO | ) | |

DEFENDANT'S OPPOSITION TO GOVERNMENT'S MOTION IN LIMINE
TO EXCLUDE MENTAL CONDITION TESTIMONY

I. Introduction

The defendant is charged with transporting aliens in violation of 8 U.S.C. 1324 (a) (1) (A) (ii). In May, 2005, defense counsel provided Assistant United States Attorney Paul Casey with a copy of a report by Dr. David Gansler, a neuropsychologist, concerning a severe brain injury the defendant suffered in March, 2004, five months before the alleged offense. The report details Mr. Bueno's injury and the effect it had on his functioning at the time of the alleged crime. In June, 2005, counsel filed notice under Fed.R.Crim.P. 12.2(b) that she would seek to introduce expert evidence relating to Mr. Bueno's mental defect at trial.

The government has moved to bar the evidence, on the following grounds: (1) the crime charged is a general intent crime and "mental condition" testimony is not admissible to negate general intent; (2) the expert testimony is inadmissible under Rules 403 and 702 of the Federal Rules of Evidence; and (3) the testimony is not admissible to assist the jury in evaluating Mr. Bueno's alleged admissions to the police. The government further moves that if the Court finds that the evidence is admissible, the Court order the defendant to submit to an examination by the government's expert.

This Court should deny the government's motion for the following reasons: (1) the crime charged is a specific intent crime; (2) due process requires that the expert testimony be admitted as evidence essential to the defense – evidence relevant to negating the elements of the crime; (3) the testimony is admissible under the Federal Rules of Evidence; and (4) the expert testimony is relevant to establish that the defendant did not in fact make the admissions he is alleged to have made to the arresting agents. Finally, the defendant asserts that the Court cannot compel the defendant to submit to an examination by the government, but if the Court finds that it can compel him, asks the Court to exercise its discretion under Rule 12.2, Fed.R.Crim.P. and not order him to submit to an examination.

II. Factual background

    A. The offense

On August 13, 2004, Jose Santos Bueno was arrested on the Massachusetts Turnpike as he was driving a white commercial van with seven passengers and another driver. The police arrested Mr. Bueno on the spot and immediately questioned him. He told them that he was driving the passengers from Texas to Massachusetts and other locations and he identified the second driver in the van, Henrique Malagon-Lara, to the police.[1] On the floor of the van was a passenger list on a form with the name of a company, "Oxford Tours" and a logo at the top.

The police determined that the passengers were seven Brazilians who were illegally in the United States. While the government's motion notes that the Brazilians informed the agents that

---

[1] Mr. Malagon-Lara, whom the government concedes was an employee of the transportation company and was "higher up" than Mr. Bueno, was originally a co-defendant in this case but his case was dismissed at the request of the government on September 14, 2004, and he was released.

2

they had paid various amounts to be smuggled into the United States, the government fails to note that it is undisputed that Mr. Bueno had nothing to do with the aliens' entering the United States; no one paid Mr. Bueno to be smuggled into the United States or paid him for the van ride from Texas to Massachusetts. In fact, the five passengers who were deposed by the government and the defendant on October 1, 2004, testified that they did not pay Mr. Bueno any money, they did not pay for the trip to Massachusetts in Mr. Bueno's presence, and the first time they saw Mr. Bueno was when they got into the van and understood that he was to be their driver (see transcripts of depositions of Creruza Maria De Oliveira, p. 28; Edilson Emidio Da Silva, pp. 24-27; Carlos Alberto Moreira, pp. 13-15; Marcio Rodriguez Dos Santos, pp. 13, 19; and Rozinei Caitano Da Silva, pp. 24-26). Further, the passengers said that during the trip they did not converse with Mr. Bueno at all (Edilson Emilio Da Silva, p. 30; Moreira, pp. 16, 21; Dos Santos, p. 20; Rozinei Caitano Da Silva, pp. 18, 27).[2] Finally, there is no evidence that Mr. Bueno ever attempted to limit the freedom of the passengers when the van stopped for fuel or food, a factor that is commonly asserted as evidence of the offense of alien smuggling. See, e.g. Edilson Emidio Da Silva, pp. 28-29; Marcio Rodriguez Dos Santos, p. 20; *United States v. Guerra-Garcia*, 336 F.3d 19, 25 (1st Cir. 2003) (defendants acted as "guards and guardians" for aliens, directing their actions).

After his arrest, the police took Mr. Bueno to the JFK Federal Building in Boston for questioning. The statement he allegedly made was reduced to writing and is attached as exhibit A. Mr. Bueno told the agents in detail how he was hired by an acquaintance to drive the van and

---

[2] One of the passengers, Creruza Maria De Oliveira, was not asked whether she spoke to him.

that this was the first time he had driven for the company. Mr. Bueno also allegedly made numerous admissions concerning the charged offense, including such statements as, "BUENO stated that based on the appearance of the passengers he believed they were all undocumented aliens," and "BUENO stated that he knew it was against the law to drive illegal aliens from Dallas, TX to Boston, MA, but that he needed the money so he did it anyway." Mr. Bueno denies making many of the statements that are attributed to him. He does remember the agents *telling* him, not asking him, about some of the statements. At least one of the statements attributed to him that he denies making, that "the passengers told him that they crossed the border about a week ago," is flatly contradicted by the testimony of the four deposed passengers cited above, who said that they did not speak to Mr. Bueno at all.

    B. <u>Mr. Bueno's personal history/ details of brain injury</u>

Mr. Bueno is thirty-two years old, a native of Mexico, and has no history of criminal convictions or even arrests. He had six years of formal schooling. He was married to Mario Veronica Alaniz in June, 1998. She is a United States citizen. He has one child, a daughter with Ms. Alaniz, who is six years old and is also a citizen. Since their marriage, Mr. Bueno and his wife lived with his wife's parents, Maria De Los Angeles Alanis and Mauro Alanis-Ramos, who are also citizens, in Dallas, Texas.[3] Mr. Bueno has extensive family in the Dallas, Texas area,

---

[3] Counsel submitted documentation, such as Mr. Bueno's marriage certificate, in support of the facts about his personal history in connection with his Motion for Review of Detention Order, filed October 14, 2004 (see exhibits A-H attached to that motion). At the time of his arrest in August, 2004, Mr. Bueno's wife had filed a petition for alien relative for him with the Immigration and Naturalization Service and he was waiting for an interview to receive his conditional residency, the first step in his getting a green card (see letter from immigration attorney Susan Church, Exhibit H attached to Motion for Review of Detention).

including his sister and three brothers and their immediate families. Most of these relatives are United States citizens.

Mr. Bueno was steadily employed by several produce companies in the Dallas, Texas area over a period of about six years. In the Spring of 2004, he was operating a fork lift at work when he fell off and hit his head on a concrete floor. Medical records from the Baylor University Hospital and the Baylor Institute for Rehabilitation establish that on March 3, 2004, he was brought to the emergency room and then admitted to the hospital. When he was first admitted, his condition was described as

> intracerebral hemorrhage, obstructive hydrocephalus, acute respiratory failure, musculoskeletal symptoms referable to limbs, flaccid hemiplegia and hemiparesis affecting nondominant side, dysphagia, coma, abnormality of gait, unspecified organic brain syndrome (chronic), encephalopathy, unspecified, hypopotassemia, and fever.

Report of David Gansler, Neuropsychologist, p. 2, "Medical Record Review," Exhibit B attached to government's motion (hereinafter "Report").

A head CT scan revealed that Mr. Bueno had a "massive intraventricular hemorrhage" (Report, pp. 2-3). Dr. Gansler's report states that he had a "significant neurologic insult in the form of a 'massive' right frontal intracranial hemorrhage with extension into the ventricular system" (Report p. 6). He was in a coma and paralyzed on his left side for about three days, after which he "began to respond to pain on the left side, is described as stuporous, and was opening his eyes to command" (Report p. 3). Ten days after his admission to the hospital, on March 13, he was transferred to the inpatient division of the Baylor Institute for Rehabilitation. His rehabilitation orders were for physical therapy, occupational therapy, speech therapy, and neuropsychology "based on diagnoses of status/post cerebral vascular accident, left-sided hemiparesis and neglect, abnormality of gait, and cognitive-communication deficits" (Report p.

2). He remained in inpatient rehabilitation for about a month, until April 11, 2004. He then underwent outpatient rehabilitation for another five weeks, until May 21, 2004 (Report p. 2).

On March 18, 2004 a clinical neuropsychologist noted that Mr. Bueno suffered from "severe deficits of attention, executive function, visuospatial ability, as well as judgment and insight, along with moderate deficits of construction and short-term memory" (Report p. 3). As part of his rehabilitation he was given an IQ test and was assessed at 79, which is in the 9th percentile (Report p. 3).

C.  Dr. Gansler's report

Dr. David Gansler is a Neuropsychologist. His C.V. is attached as exhibit B. He was asked to examine Mr. Bueno to determine the effect that Mr. Bueno's brain injury might have had on his thinking and behavior in connection with the charged offense.

Dr. Gansler met Mr. Bueno at the Wyatt Correctional Facility and administered thirteen tests to him: Mini-mental status examination (MMSE); Testo de Vacabulario en Imagenes Peabody (TVIP); Wechsler Adult Intelligence Scale-III (WAIS-III); Personality Assessment Inventory (PAI-Spanish language version); Trail Making Test; Grooved Pegboard Test; Wisconsin Card Sorting Test (WCST); Controlled Oral Word Association Test (COWAT); Mesulam's Letter Cancellation; Hooper Visual Organization Test (HVOT); Wechsler Memory Scale-Revised (WMS-R); Roy-Osterreith Complex Figure Test (ROCFT); and TOMM. Detailed comments concerning the results of each test are found at pages 4-6 of his Report.

Dr. Gansler summed up his review of Mr. Bueno's medical records as follows:

> His diagnoses included - status/post cerebral vascular accident, left-sided hemiparesis and neglect, abnormality of gait, and cognitive-communication deficits. The acute clinical neuropsychological examination revealed severe deficits, and at seven weeks recovery continued to demonstrate deficits in executive functioning, memory, and visual spatial

ability. At six weeks post-stroke, intellectual testing revealed an IQ of 79, which placed Mr. Bueno at 9% of the population. At time of discharge he was given information for the Texas Department of Disability and Rehabilitation Services, as his occupational prognosis was unclear. Though it was recorded that Mr. Bueno intended to return to his same employment, he did not return to competitive employment after CVA. The discharge summary also contained very qualified statements regarding Mr. Bueno's judgment, problems-solving, and safety.

(Report p. 6).

He reported the following observations and conclusions concerning his examination and testing of Mr. Bueno:

> Behavioral observations were unremarkable. Upon mental status examination, Mr. Bueno was not completely oriented to place, had trouble completing basic cognitive tasks, endorsed sadness of mood, and complained of headaches. Clinical neuropsychological examination indicates Mr. Bueno's pre-injury intellect was in the low average range. Current intellectual level is in the borderline range, which is consistent with the sub-acute findings at Baylor Rehabilitation. There was an unusually high degree of inter-test scatter upon neuropsychological examination consistent with an abnormal test result. Areas of relative strength include categorical thinking, verbal fluency, fine motor speed and control bilaterally, complex visuo-perception, as well as verbal learning and recall. Areas of relative weakness include planning, organization of complex responses, visuo-spatial ability, as well as visual learning and recall.

(Report pp. 6-7)

In conclusion, Dr. Gansler reports:

> Mr. Bueno presents with neuropsychological dysfunction, moderate in degree, which is consistent with the right frontal vascular insult he sustained in March of 2004. There has been a substantial decline in cognitive functioning that occurred as a result of the insult. As this evaluation occurred eleven months post-insult it is a valid reflection of Mr. Bueno's new (lower) baseline level of functioning with further physiological recovery unexpected at this point.
>
> The nature of neuropsychological deficit is such that Mr. Bueno will have difficulty exercising judgment, appraising novel circumstances, considering the consequences of his actions (or statements), and in developing and executing appropriate plans of action. The degree of this deficit is significant and is predicted to have a negative impact on Mr. Bueno's capacity to adapt to his environment. This type of presentation is typical of frontal lobe insult to the brain. Individuals with this type of dysfunction are known to be vulnerable to suggestion, and they are typically advised to

have family members involved in major decision making. Such advice would apply to Mr. Bueno. In effect, it could be argued that the events of the summer of 2004 provide a clear demonstration of the decline in Mr. Bueno's capacities and detrimental impact upon his ability to adapt successfully to his environment. As the insult occurred in March of 2004, the arrest occurred in August of 2004, and he was evaluated in February of 2005, the present findings are a clear indication of his capacities and limitations at the time of his arrest.

(Report p. 7).

III. Argument

    A. Introduction

The defendant is charged with transporting illegal aliens in violation of 8 U.S.C. § 1324 (a) (1) (A) (ii). The government must prove four elements: (1) the aliens were not lawfully in the United States; (2) the defendant knew or recklessly disregarded that fact; (3) the defendant transported the aliens; and (4) the defendant acted willfully in furtherance of the aliens' illegal presence in the United States. *United States v. Guerra-Garcia*, 336 F.3d 19, 23 (1st Cir. 2003).

The defendant anticipates that the government will attempt to prove these elements by asking the jury to consider the following facts: the passengers were in fact illegal aliens; the defendant was driving the van; he observed the passengers; the passengers all spoke Portuguese, not English; they had little or no luggage; and various details concerning the trip (for example, the passengers were dropped off at different destinations), suggest that this was not a tour bus or a typical commercial transportation trip. From these facts, defendant anticipates the government will ask the jury to infer that the defendant is guilty because he "must have known" that the passengers were illegal aliens and that his transportation of them was in furtherance of their being present illegally. Presumably the government will also argue that the defendant's statements, in which he allegedly admitted that he knew the passengers were illegal aliens,

establish the defendant's guilt. (See, e.g., *Guerra-Garcia*, *supra*, 336 F.3d at 12-15, for list of factors in similar case which court finds in combination provide sufficient proof of guilt.)

The defendant intends to argue that, in fact, given the effects of his brain injury and borderline IQ, he did not know or recklessly disregard the fact that the passengers were illegal aliens and his transportation of them was not in furtherance of their illegal presence; because of his limitations, inferences which may have been obvious to normal people were not clear to him. Second, with regard to the statements the government will introduce against him, he intends to argue that his brain injury made him susceptible to suggestion so he simply agreed with many statements posed to him by his interrogators, and he is simply incapable of making some of the inferences and conclusions attributed to him. In order for the defendant to communicate his defense to the jury, it is necessary to have an expert describe the type of brain injury Mr. Bueno suffered and the effects the injury had on his cognitive functioning.

    B.    <u>The Insanity Defense Reform Act of 1984 does not preclude the admissibility of the proffered evidence</u>

The government argues that the Insanity Defense Reform Act limits the use of psychiatric evidence in cases such as Mr. Bueno's (see, e.g., government motion p. 10). The Insanity Defense Reform Act has nothing to do with Mr. Bueno's defense in this case. He is not raising an insanity defense; rather, he is seeking to present evidence of his limitations in order to establish that he did not have the state of mind that is an element of the offense and to provide the jury with a basis for evaluating the probative value of the his alleged statements. See *United States v. Pohlot*, 827 F.2d 889, 897 (3rd Cir. 1987) (citing cases from "several United States Court of Appeals" that establish that "the use of expert testimony for this purpose [state of mind]

is entirely distinct from the use of such testimony to relieve a defendant of criminal responsibility based on the insanity defense").

18 U.S.C. § 17 redefined the insanity defense, making it an affirmative defense requiring proof by clear and convincing evidence. The final sentence of § 17(a) provides, "Mental disease or defect does not otherwise constitute a defense." It is well-settled that this phrase was intended to apply to the defense of insanity and in no way prevents a defendant from offering "mental-condition evidence short of insanity." See *United States v. Schneider*, 111 F.3d 197, 201 (1st Cir. 1997) (18 U.S.C. § 17 not intended to exclude a defendant from offering mental condition evidence to negate state of mind, quoting LaFave and Scott: "The reception of evidence of the defendant's abnormal mental condition, totally apart from the defense of insanity, is certainly appropriate whenever that evidence is relevant to the issue of whether he had the mental state which is a necessary element of the crime charged"); *United States v. Marenghi*, 893 F. Supp. 85, 89 (D. Me. 1995) (collecting cases); *United States v. Pohlot*, *supra*, (discussing at length how mental abnormality evidence is admissible to negate mens rea). See also, *United States v. Stambaugh*, 339 F. Supp. 2d 534 (S.D.N.Y. 2004) (legislative history of Insanity Defense Reform Act indicates it was not intended to prevent defendants from presenting mental condition evidence to negate intent).

C. 8 U.S.C. § 1324 (a) (1) (A) (ii) is a specific intent crime

The government argues that evidence of mental defect is admissible only to negate intent with regard to "specific intent" crimes (government motion p. 9) and that since the crime charged here is a general intent crime, the defendant is precluded from offering evidence of his brain injury. The defendant argues below in part D that the rubrics of "specific" and "general" intent are disfavored because they are so confusing and imprecise, and that due process requires that the

defendant be permitted to put on evidence of his brain injury to negate the elements of the offense. Even if one uses these labels, however, the crime charged here is a specific, not a general, intent crime.

> To establish the fourth element of the crime of transporting illegal aliens:
>
> the government must prove that the defendant acted willfully in furtherance of the alien's violation of the law ... There must be a direct and substantial relationship between the transportation and its furtherance of the alien's presence in the United States .. . Wilful transportation of illegal aliens is not, per se, a violation of the statute, for the law proscribes such conduct only when it is in furtherance of the alien's unlawful presence.
>
> *United States v. Morales-Rosales*, 838 F.2d 1359 (5th Cir. 1988), quoted approvingly in *United States v. Medina-Garcia*, 918 F.2d 4, 8 (1st Cir. 1990).

This requires that the government prove that the defendant acted with the specific intent of furthering the alien's illegal presence. See *United States v. Moreno-Duque*, 718 F. Supp. 254, 259 (D.Vt. 1989) ("In other words, the government must prove that the defendants specifically intended by means of the transportation to advance or assist the alien's violation of law"); *United States v. Merkt*, 764 F.2d 266, 271-72 (5th Cir. 1985) (statute punishes "intentional act" performed with "specific intent" to further alien's illegal presence); *United States v. Perez-Gonzalez*, 307 F.3d 443, 446 (6th Cir. 2002) ("Looking to the present case, we find that there was sufficient evidence for a reasonable jury to conclude that Perez-Gonzalez wilfully transported illegal aliens with the specific intent of furthering their illegal presence in the United States"); *United States v. Stonefish*, 402 F.3d 691,695 (6th Cir. 2005) (government must prove "specific intent" of defendant was "to deliberately assist an alien in maintaining" his illegal presence); *United States v. Barajas-Chavez*, 134 F.3d 1444 (10th Cir. 1998) (same).

The government cites a Ninth Circuit case, *United States v. Ramirez-Martinez*, 273 F. 3d 903, 914 (9th Cir. 2001), for the proposition that "transporting under § 1324 (a) (1) (A) (ii) is a

general intent crime" (government motion p. 11). In that case the court did not mention the fourth element of the crime, which, as set forth above, does require that the government prove that the defendant acted with the specific intent of furthering the alien's illegal presence. Moreover, the *Ramirez* court's characterization of the crime as a "general intent" crime seems inconsistent with other decisions in the Ninth Circuit, such as *United States v. Moreno*, 561 F. 2d 1321, 1323 (9th Cir. 1977), which provides that in order to prove the fourth element, the government must prove a "direct or substantial relationship between that transportation and its furtherance of the alien's presence in the United States." This is precisely the test that the First Circuit has adopted, see *Medina-Garcia*, *supra*, at 8-9, and it is this element that courts have said requires proof of the defendant's "willful" conduct in furthering the alien's illegal presence.[4] In *United States v. Merkt*, *supra*, for example, the Court of Appeals for the Fifth Circuit adopted the test set out in *Moreno* for proof of a "direct and substantial relationship" between the transportation and the alien's illegal presence, and then affirmed that this test requires that the government prove the defendant's "specific intent." *Merkt*, *supra*, 764 F.2d at 271-72.

In sum, the crime charged here does require proof of "specific intent," and the defendant must be permitted to put on mental defect evidence to demonstrate that he did not have the intent to commit the crime. See *United States v. Schneider*, *supra,* 111 F.3d at 202 (district court had discretion to admit expert evidence that defendant's medical condition demonstrated that he lacked intent to deceive, but under circumstances of case, decision to exclude it was not error);

---

[4] The Ninth Circuit has stated that "[w]illfulness requires that an act be done knowingly and intentionally, not through ignorance, mistake or accident." *United States v. Morales*, 108 F.3d 1031, 1036 (9th Cir. 1997) (affirming convictions for misdemeanor offenses of willfully making false entries). See also *United States v. Sehnal*, 930 F.2d 1420, 1427 (9th Cir. 1991) (in prosecution for filing false tax returns, approving instruction: "An act is done willfully if done voluntarily and intentionally with the purpose of violating a known legal duty").

*United States v. Staggs*, 553 F.2d 1073, 1075 (7th Cir. 1977) (reversible error for judge to preclude defendant from putting on expert testimony that his mental state made it unlikely that he threatened to shoot approaching policeman), cited approvingly in *United States v. Pohlot*, *supra*, 827 F.2d at 897; *United States v. Saban-Gutierrez*, 783 F. Supp. 1538 (D.P.R. 1991) (defendant granted new trial based on post-trial discovery that he was mentally retarded and may not have possessed the mens rea for violating 46 U.S.C. § 1903, possession with intent to distribute a controlled substance on a vessel). See *United States v. Saban Gutierrez*, 961 F. 2d 1565 (1st Cir. 1992) (unpublished opinion affirming decision of District Court).

> D. <u>Regardless of whether one characterizes the offense as requiring proof of "general" or "specific" intent, Mr. Bueno must be permitted to put on mental defect evidence to negate the elements of the crime</u>

While cases that discuss the admissibility of "mental defect" evidence often note that such evidence is admissible to negate the "specific intent" of a defendant, (see government motion p. 9 and cases cited), defendant submits that whether the crime here is labeled "general" or "specific" intent should not dictate whether he may present his defense. The use of the terms "specific" and "general" intent is problematic and has led to a great deal of confusion in the case law.

> The meaning of the word "intent" in the criminal law has always been rather obscure, largely as a result of the use in such phrases as "criminal intent," "general intent," "specific intent," "constructive intent," and "presumed intent." Intent has traditionally been defined to include knowledge, and thus it is usually said that one intends certain consequences when he desires that his acts cause those consequences or knows that those consequences are substantially certain to result from his acts. The modern view, however, is that it is better to draw a distinction between intent (or purpose) on the one hand and knowledge on the other.
>
> *LaFave & Scott, Substantive Criminal Law* § 3.5 pp. 302-303 (1986).

Jury instructions on "specific" and "general" intent are disfavored because of the confusion they cause. "No jury instruction is provided or should be given for the term 'specific intent' because the law has grown and now developed away from charging the jury on this concept." O'Malley, Grenig, and Lee, *Federal Jury Practice and Instruction*, Fifth Ed. § 17.03 p. 564. The United States Supreme Court has noted that jury instructions on specific intent are "too general and potentially misleading," *Liparota v. United States*, 471 U.S. 417, 433 n.16 (1985). Distinctions between "specific" and "general" intent are more likely to confuse than enlighten juries. *United States v. Bailey*, 444 U.S. 394, 398-413 (1980). "Each of the jury instruction committees of the circuit courts of appeal have followed suit and discouraged the use of jury instructions on specific intent." *Federal Jury Practice and Instruction*, supra at § 17.03 p. 565.

What matters is not whether a crime is labeled "specific intent" or "general intent," but what the government has to prove in order to make out its case. "Where a precise mental state is an element of the offense charged, that mental state should be clearly set out in the 'elements of the offense charged' instruction to the jury." *Federal Jury Practice and Instruction*, supra at § 17.03 p. 565. Here, there is no question that the government must prove that Mr. Bueno knew that the people he was transporting were illegal aliens, and that he must have had the intent, by transporting them, to further their illegal presence. The mental abnormality evidence that the defendant seeks to present is critical to the jury's assessment of these elements. The government presumably will argue that "any normal person" assessing the situation with which Mr. Bueno was faced would have understood that the passengers were illegal and that his transportation of the aliens was furthering their illegal presence here. Mr. Bueno, in his defense, must at least

have the opportunity to try to explain to the jury that, as a result of his brain injury, he is not normal.

The question, then, for this Court to answer is whether the defendant's proffered expert testimony is admissible under the Rules of Evidence. See *United States v. Pohlot*, *supra* at 897, ("mental disease or defect" evidence is properly understood not as a defense, but "merely a rule of evidence"). The government suggests that Dr. Gansler's testimony would violate Fed.R.Evid. 403, as its probative value would be outweighed by the prejudicial effect of confusion or by delay (government motion pp. 14-19). Dr. Gansler's proffered testimony is neither confusing nor will it be unreasonably lengthy. This is not a situation where the expert's testimony suggests to the jury that the defendant suffered from "temporary insanity," or some other forbidden defense, see *United States v. Schneider*, *supra*, 111 F.3d at 202. Nor would Dr. Gansler opine about vague psychological issues such as the claim that a defendant lacked the mens rea to distribute cocaine because of the psychological domination of her mother, see *United States v. White*, 766 F. 2d 22 (1st Cir. 1985), or that a defendant suffered from a "dependent personality disorder" that made her vulnerable to being "duped," *United States v. DiDomenico*, 985 F.2d 1159, 1161 (2nd Cir. 1993).

Further, Dr. Gansler's testimony, based on his training and background, and his understanding of neuropsychological evaluation, meets the standards in Fed.R.Evid. 702 for scientific reliability and helpfulness to the jury. He would testify to the fact that Mr. Bueno suffered a brain injury, and would explain its effects on his behavior and cognitive abilities. This testimony is grounded in fact and is indispensable to the jury's assessment of the government's proof. Exclusion of this evidence would violate the defendant's due process rights to present a

defense under the Sixth Amendment, see *Taylor v. Illinois*, 484 U.S. 400, 408 (1988); *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987).

    E.   <u>The Court should admit the expert testimony to permit Mr. Bueno to explain the effect his brain injury had on the statements he allegedly made</u>.

The government will also seek to introduce the defendant's purported statements to the agents after his arrest, statements which the government will maintain contain direct admissions of guilt. The defendant intends to argue that with regard to some of the alleged admissions, Mr. Bueno was merely agreeing with statements the agents were making, and that he was not capable of making other statements which require sophisticated reasoning. The defendant's argument concerning his statements will not make sense to the jury unless the defendant is allowed to present expert evidence concerning his brain injury and the effect it had on his interaction with the agents, his understanding of what he was doing when he spoke to them, and his ability to draw inferences and reason.

In *United States v. Shay*, 57 F.3d 126 (1st Cir. 1995), the Court held that the district court erred in excluding expert testimony that the defendant suffered from a mental disorder that caused him to make grandiose, untrue statements similar in nature to the statements that the government was seeking to use against him. The Court found that under Fed.R.Evid. 702, the testimony would have "assisted the trier of fact to understand the evidence or determine a fact in issue" because the jury was not qualified to determine whether the defendant may have made false statements because he suffered from a mental disorder, and "it was a clear error in judgment for the district court to exclude the testimony under any plausible interpretation of Rule 702." *Id*. at 133-134.

In *United States v. Gonzalez-Maldonado*, 115 F.3d 9, 16-17 (1st Cir. 1997), the Court held that it was error for the District Court to exclude expert testimony that would have established that the defendant had a mental illness that led him to be verbose and exaggerate, where such testimony would have assisted the jury in deciding what weight to give tape-recorded statements:

> The government argues that [the expert's] testimony should be disallowed because the taped conversations featured current actions which were largely corroborated. To the extent that [the defendant] did suffer from the mental illness at issue, however, [the expert's] testimony could be relevant to the credibility of current statements. The defense theory is that the defendant exaggerated his situation in statements that he made – a claim for which [the expert's] testimony is clearly relevant. That the statements were, in the view of the government, accurate, is something for the jury to consider in its deliberations. It goes to the weight to be given to the evidence and is not a reason to exclude [the expert's] testimony.

*Id*. at 16.

The evidence the defendant seeks to introduce here, that he had a severe brain injury that affected the reliability of his statements to the agents, is admissible under the Federal Rules of Evidence. Dr. Gansler will testify that while Mr. Bueno presents as a normal person and has "verbal fluency," that is, he appears to respond appropriately to questions, in fact his intellectual functioning is at the "borderline range," very close to the range that qualifies as mentally retarded. He will explain to the jury that the type of brain injury Mr. Bueno suffered typically makes people vulnerable to suggestion. His testimony will assist the jury in assessing whether Mr. Bueno actually said what he is alleged to have said to the agents, or whether he was just agreeing with statements they were making. In *Shay*, *supra*, the Court held that the expert's testimony on the defendant's mental condition, which caused him to confess to something he did not do, was necessary because "[c]ommon understanding conforms to the notion that a person ordinarily does not make untruthful inculpatory statements," *Shay*, *supra* at 133. Similarly, here, if Dr. Gansler is not permitted to testify, the jury will not understand why Mr. Bueno would have

17

agreed to inculpatory statements. Dr. Gansler will also help the jury understand whether Mr. Bueno was even intellectually capable of drawing inferences which the agents claim that he drew. In addition, the evidence will not be confusing or lengthy so as to support exclusion under Fed. R. Evid. 403. Compare *Shay*, *supra*, 57 F.3d at 131 n.4 (noting that testimony concerning "broad and undefined psychological traits" "or clinical states such as 'repression' or 'dependency'" are not admissible under Federal Rules).

IV.  The Court should deny the government's request to conduct an examination of the defendant.

The government asks the Court, if it allows Dr. Gansler's testimony, to permit the government to conduct its own psychological examination of the defendant.[5] Fed. R. Crim. P. 12.2 (b) provides that the Court "may" order the defendant examined "under procedures ordered by the Court." There is a split of authority concerning whether Rule 12.2 entitles the government to conduct a compelled mental examination of the defendant. *Compare*, *United States v. Davis*, 93 F.3d 1286, 1293-4 (6th Cir., 1996) (no authority to order examination), with *United States v. Lewis*, 53 F.3d 29, 35 n.9 (4th Cir. 1995) (district court may compel examination). The only case in this Circuit concerning the issue found by counsel is *United States v. Holdaway*, 1999 U.S. Dist. LEXIS 18319, in which Magistrate Judge Collings ruled that a defendant could be ordered to submit to an examination under the Rule. See *United States v. Holdaway*, 1999 LEXIS 20624, District Court, Lindsay, J., affirming order of Mag. Judge Collings.

---

[5] Rule 12.2 (b) provides that the defendant need only notify the government if he intends to offer expert testimony relating to a mental defect bearing on the issue of guilt. Therefore if the Court decides that the defendant's proffered evidence is to be admitted only on issues relating to the defendant's statements, Rule 12.2 does not apply and the Court may not order an examination pursuant to that Rule.

18

The defendant objects to the Court's ordering him to submit to an examination. If the Court finds that it has the power to so order him, he asks the Court to exercise the discretion given it by the Rule and not order the defendant to be further examined. Trial is now less than sixty days away. Counsel has long since provided the government with her expert's report, his C.V., a summary of his expected testimony, and the "rough data" from the testing which he did on the defendant. The government has pointed to no deficiencies or problems with the defendant's expert's testing or report or suggested any reason why further examination by an expert of its choosing is necessary. In the *Holdaway* case, above, the defendant was seeking to put on psychiatric evidence that she was "subject to 'panic attacks, as well as the repeated trauma of domestic violence,'" so that she was "incapable of free will during the time of her charged criminal conduct." *Holdaway*, *supra* at 2. The Court found that the government could counter the evidence only with "the basic tool of psychiatric study," the "personal interview." *Holdaway*, *supra* at 9, quoting *United States v. White*, 21 F. Supp. 2d 1197, 1198-1201 (E.D. Cal., 1998). Here, the defendant is not seeking to put on evidence of a psychiatric illness. Dr. Gansler's opinion is based on a review of Mr. Bueno's medical records concerning a brain injury and the results of objective psychological testing done on the defendant, not a subjective psychiatric interview. The government is free to produce an expert at trial to comment on Dr. Gansler's work and conclusions; it is not necessary that the defendant be ordered to submit to further testing for the government to have a fair opportunity to "prepare for cross-examination of the defendant's expert witnesses and to present any rebuttal witnesses to counter the defense expert's testimony." *United States v. Buchbinder*, 796 F.2d 910, 915 (7th Cir. 1986). At the least, the government should be required to make some showing as to why an evaluation of the defendant is necessary.

Should the Court order the defendant to submit to an examination, the defendant asks the Court to rule as to the conditions of the examination and the extent to which evidence gathered during the compelled mental examination may be used.  See *United States v. Holdaway*, *supra* at 9.

V. <u>Conclusion</u>

For the reasons stated above, the defendant asks the Court to deny the government's motion in limine to prevent Dr. Gansler from testifying.  The defendant further asks that the Court not require him to submit to any compelled examination by the government.

JOSE SANTOS BUENO
By his attorney,

/s/ Page Kelley
Page Kelley
  B.B.O. #548237
Federal Defender Office
408 Atlantic Avenue, 3rd Floor
Boston, MA  02110
Tel: 617-223-8061