**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **UNITED STATES of AMERICA** | |
| **v.** | |
| **JOSE SANTOS-BUENO,** | **Criminal No. 04-40023-FDS** |
| **Defendant.** | |

**MEMORANDUM AND ORDER ON**
**GOVERNMENT'S MOTION TO EXCLUDE EXPERT TESTIMONY**

**SAYLOR, J.**

Defendant Jose Santos-Bueno has been charged in a one-count indictment with transporting illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(ii). Defendant intends to offer expert testimony from a neuropsychologist regarding the impact of a brain injury on his cognitive abilities. The purpose of the testimony is two-fold: first, to rebut the government's evidence that he formed the requisite mental state to commit the crime, and second, to challenge the accuracy and reliability of inculpatory statements he made to law enforcement authorities following his arrest. Specifically, defendant contends that evidence of his limited cognitive ability should be admitted to show that he did not make the reasonable inferences a more normal person would have made under the circumstances of the alleged offense. He further contends that his limited cognitive ability made him unusually vulnerable to suggestion and that therefore he falsely acknowledged the truth of certain statements to the authorities.

The government has moved *in limine* to exclude the expert testimony on essentially three grounds: (1) that the testimony is precluded by the Insanity Defense Reform Act of 1984, 18 U.S.C. § 17 ("IDRA"); (2) that it is not sufficiently reliable and relevant under Fed. R. Evid. 702

and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993); and (3) that its probative value is substantially outweighed by its potential to mislead and confuse the jury under Fed. R. Evid. 403. The government has also moved, pursuant to Fed. R. Crim. P. 12.2(c)(1)(B), for the right to have its own expert examine the defendant should the Court decide to admit any portion of the expert testimony.

For the reasons that follow, the government's motion will be denied in part, and decision will be reserved as to the remaining part. The neuropsychologist will be permitted to testify at least as to defendant's limited cognitive abilities. Although the Court has serious doubts about the admissibility of testimony that defendant was unusually vulnerable to suggestion, the Court will permit defense counsel to provide further briefing on that issue, as discussed below. The Court will also order that the defendant submit to an examination by a government expert, under terms and conditions to be determined at the upcoming status conference on January 13, 2006.

## I. Factual Background

### A. Criminal Investigation

On August 13, 2004, agents from the Bureau of Immigration and Customs Enforcement ("ICE") received information that a white van with Texas license plates was carrying illegal aliens and was heading towards the Boston area. The agents asked Massachusetts State Police for assistance in locating the vehicle.

The same day, the Massachusetts State Police stopped the van on the Interstate 90 in Southborough, Massachusetts. Santos-Bueno was driving the vehicle; there was another individual, Henrique Malagon-Lara, and seven additional passengers inside. Santos-Bueno told police that he and Malagon-Lara, who shared driving responsibilities, were transporting the

passengers from Texas to Massachusetts and other east coast destinations. On the floor between the driver and passenger seats was a list of fourteen names, which included, among other things, the names of the seven passengers, the notation "PAID" next to each of the seven, and a destination and telephone contact for each. The list was printed on letterhead for a company called "Oxford Tours," which apparently owned the van.

All seven passengers were Brazilian nationals who were illegally in the United States. The passengers did not speak English and, except for a single backpack, had no luggage with them.[1]

After arresting Santos-Bueno, police took him to the John F. Kennedy Federal Building in Boston for questioning by federal agents. The agents made a written report of their interrogation. According to that report, Santos-Bueno described in detail how an acquaintance had put him in touch with an individual called "Junior," who then hired him to transport the aliens from Texas to various destinations. Junior allegedly provided Santos-Bueno with the van, the passenger manifest, instructions regarding the drop-offs, and $400 to pay for gas and tolls. Prior to his encounter with the police, Santos-Bueno had dropped off seven other Brazilian nationals named on the passenger manifest at various locations, including Virginia, New York, and Connecticut. Santos Bueno was to return the van to a particular gas station in Dallas on August 14. For his services, Santos-Bueno was to be paid between $400 and $500.

According to the report, Santos-Bueno made several detailed admissions regarding the purported crime:

> BUENO asked Junior if the passengers in the van were illegal. Junior told him that if he wanted the work not to ask any questions. BUENO stated that based on the

---

[1] According to a report filed by federal agents, Santos-Bueno indicated that the fourteen passengers who began the trip collectively had two bags. Apparently, only one remained in the van when investigators searched it.

> appearance of the passengers he believed they were all undocumented aliens. BUENO stated that he felt if the passengers were legal, they would have traveled in a bus, where they would have been more comfortable with their own seat, instead of crammed into a van. BUENO stated that the fact that [they] only had 2 suitcases for 14 people lead to his conclusion that they were undocumented. BUENO stated that [the fact that] the passengers only spoke Portuguese made him believe that they were all Brazilians. BUENO stated that he knew it was against the law to drive illegal aliens from Dallas, TX to Boston, MA, but that he needed the money so he did it anyway.

In addition, "BUENO said that the passengers told him that they crossed the border about a week ago."

Santos-Bueno denies making many of the statements attributed to him in the report. In essence, he contends that the agents asked him leading and/or suggestive questions to which he gave affirmative (but untrue) responses, due to his mental condition.

**B. <u>Psychological Evaluation</u>**

Dr. David Gansler, a neuropsychologist hired by the defense, evaluated Santos-Bueno in February 2005. The purpose of the evaluation was to determine the cognitive and behavioral impact of a brain injury Santos-Bueno had suffered in the spring of 2004, some six months before the alleged crime.[2] That injury appears to have stemmed from a fall from a forklift at work.

According to Dr. Gansler, the fall likely resulted in a "slow bleed" in defendant's brain, which became symptomatic a week later, when he was taken to the Baylor Health Care System Emergency Department on March 3, 2004. Doctors there diagnosed Santos-Bueno with what was, in substance, a serious stroke. The hospital's neurology department determined that surgery was not appropriate to treat the hemorrhage. Santos-Bueno was placed on a ventilator and

[2] Unless otherwise indicated, all facts surrounding the existence, diagnosis, and treatment of Santos-Bueno's injury are taken from Dr. Gansler's report.

sedated. He remained in a coma and was paralyzed on his left side for about three days. By March 8, he had improved considerably and was described as more alert and talking. On March 13, he was transferred to the inpatient division of the Baylor Institute for Rehabilitation, where he remained until April 11. He then underwent outpatient rehabilitation three times per week until May 21.

Dr. Gansler's evaluation was based on Santos-Bueno's self-reported medical and personal background; a review of court records, including those of this case; a review of medical records; and the administration of thirteen standardized tests, including the Weschler Adult Intelligence Scale-III.[3] Dr. Gansler interviewed Santos-Bueno and conducted the tests on February 11 and 18, 2005.

Dr. Gansler's written report states that "[u]pon mental status examination, Mr. Bueno was not completely oriented to place [and] had trouble completing basic cognitive tasks." He opines that "Mr. Bueno's pre-injury intellect was in the low average range. Current intellectual level is in the borderline range." The report concludes:

> Mr. Bueno presents with neurological dysfunction, moderate in degree, which is consistent with the right frontal vascular insult he sustained in March of 2004. There has been a substantial decline in cognitive functioning that occurred as a result of the insult. As this evaluation occurred eleven months post-insult it is a valid reflection of Mr. Bueno's new (lower) baseline level of functioning, with further physiological recovery unexpected at this point.
>
> The nature of neuropsychological deficit is such that Mr. Bueno will have

[3] Dr. Gansler administered the following tests: Mini-Mental Status Examination (MMSE); Testo de Vocabulario en Imagenes Peabody (TVIP); Weschler Adult Intelligence Scale-III (WAIS-III) Test; Personality Assessment Inventory (PAI-Spanish language version); Trail Making Test; Grooved Pegboard Test; Wisconsin Card Sorting Test (WCST); Controlled Oral Word Association Test (COWAT); Mesulam's Letter Cancellation Test; Hooper Visual Organization Test (HVOT); Weschler Memory Scale-Revised (WMS-R) Test; and Roy-Osterreith Complex Figure Test (ROCFT).

> difficulty exercising judgment, appraising circumstances, considering the consequences of his actions (or statements), and in developing and executing appropriate plans of action. The degree of this deficit is significant and is predicted to have a negative impact on Mr. Bueno's capacity to adapt to his environment. This type of presentation is typical of frontal lobe insult to the brain. Individuals with this type of dysfunction are known to be vulnerable to suggestion, and they are typically advised to have family members involved in major decision making. Such advice would apply to Mr. Bueno. In effect, it could be argued that the events of the summer of 2004 provide a clear demonstration of the decline in Mr. Bueno's capacities and detrimental impact upon his ability to adapt successfully to his environment. As the insult occurred in March of 2004, the arrest occurred in August 2004, and he was evaluated in February of 2005, the present findings are a clear indication of his capacities and limitations at the time of arrest.

## II. **Analysis**

In order to prove a violation of § 1324(a)(1)(A)(ii), the government must prove four elements: "(1) the alien[s] named in the indictment . . . [were] not lawfully in the United States; (2) defendant[] knew or recklessly disregarded that fact; (3) defendant[] transported the alien[s] . . .; and (4) defendant[] acted willfully in furtherance of the alien[s'] illegal presence in the United States." *United States v. Guerra-Garcia*, 336 F.3d 19, 23 (1st Cir. 2003).[4]

The testimony at issue relates to defendant's mental state, and therefore only the second and fourth elements are relevant here. To prove those two elements, the government intends to offer both circumstantial and direct evidence. As to the former, the government intends to argue that, based on the circumstances of the vehicle journey, any reasonable person would have inferred that the passengers were illegal aliens, and that delivering those passengers to various points on the east coast would further their illegal presence in the United States. As to the latter,

[4] The text of § 1324(a)(1)(A)(ii) provides: "Any person who . . . knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law . . . shall be [guilty of an offense]."

the agents who questioned Santos-Bueno contend he admitted that he knew his passengers were illegal aliens and that he nonetheless intended to transport them.

Defendant seeks to introduce Dr. Gansler's testimony to rebut both points. First, defendant intends to have Dr. Gansler testify that defendant's brain trauma caused persistent and significant cognitive deficits. Based on that evidence, defendant intends to argue that any rational inferences from the facts that may have been obvious to a normally functioning person were not obvious to him.[5] Second, defendant intends to have Dr. Gansler testify that people with defendant's mental condition "are known to be vulnerable to suggestion." Defendant then intends to argue that, as a result, the statements he allegedly made in his interview with the agents were unreliable and untrue.[6]

The Court will first address the testimony related to defendant's cognition. The analysis will proceed in three steps: first, whether the evidence is precluded by IDRA; second, whether it is admissible under Rule 702 and *Daubert*; and third, whether it should be excluded under Rule 403.

## A. <u>Evidence Concerning Defendant's Ability to Make Factual Inferences</u>

### 1. <u>The Insanity Defense Reform Act</u>

[5] Defendant does not, apparently, intend to elicit testimony from Dr. Gansler to the effect that the defendant has "difficulty exercising judgment, appraising circumstances, considering the consequences of his actions (or statements), and in developing and executing appropriate plans of action."

[6] Defendant challenges the accuracy and reliability, not the voluntariness, of the statements.

The Insanity Defense Reform Act provides that insanity is an affirmative defense requiring proof by clear and convincing evidence, and that "[m]ental disease or defect does not otherwise constitute a defense." 18 U.S.C. § 17. In enacting IDRA, Congress intended to preclude "the use of 'non-insanity' psychiatric evidence that points toward exoneration or mitigation of an offense because of a defendant's supposed psychiatric compulsion or inability or failure to engage in normal reflection." *United States v. Cameron*, 907 F.2d 1051, 1066 (11th Cir. 1990) (internal quotation marks omitted); *accord United States v. Pohlot*, 827 F.2d 889, 890 (3rd Cir. 1987).

Although IDRA precludes such "diminished responsibility" testimony, it "does not preclude a defendant from offering evidence to negate a requisite state of mind" that is an element of a criminal offense. *United States v. Schneider*, 111 F.3d 197, 201 (1st Cir.1997). The line between "diminished capacity" evidence and "negation of *mens rea*" evidence is, however, far from clear. Several appellate courts have drawn that line at the boundary between so-called "general intent" and "specific intent" crimes, holding that expert testimony concerning a defendant's impaired mental capacity is admissible only to defeat the mental state requirement of a specific intent crime. *See, e.g., United States v. Gonyea*, 140 F.3d 649, 650 (6th Cir.1998); *United States v. Fazzini*, 871 F.2d 635, 641 (7th Cir. 1989); *Cameron*, 907 F.2d at 1063 n.20; *United States v. Twine*, 853 F.2d 676, 679 (9th Cir. 1988).

In adopting this distinction, courts have recognized that mental conditions or defects would rarely, if ever, negate a "general intent" requirement, *Pohlot*, 827 F.2d at 897 n.4, given that "general intent" demands only "proof of knowledge with respect to the *actus reus* of the crime," *Carter v. United States*, 530 U.S. 255, 269 (2000). Specific intent, in contrast, generally requires an intention to violate a known legal duty—in other words, the defendant must

specifically intend to commit the crime. *See, e.g.*, *United States v. Gibbs*, 182 F.3d 408, 433 (6th Cir. 1999) ("In a specific intent crime, 'the defendant must . . . act with the purpose of violating the law.'") (citation omitted); *see also* Wayne R. LaFave, SUBSTANTIVE CRIMINAL LAW § 5.2(e), at 354 (2d ed. 2003) (noting that specific intent generally indicates "a special mental element . . . above and beyond any mental state required with respect to the *actus reus* of the crime"). Thus, when specific intent is at issue, psychiatric evidence may be admissible, given "the increased probing into the defendant's subjective state of mind that accompanies the trial of a specific intent offense." *Twine*, 853 F.2d at 679.

The First Circuit has not yet adopted the general/specific intent distinction under IDRA, nor has it expressly decided whether transportation of aliens under § 1324(a)(1)(A)(ii) is a specific or general intent crime. The parties dispute the latter issue, and there is case authority in support of both positions. *Compare United States v. Ramirez-Martinez*, 273 F.3d 903, 914 (9th 2001) ("Actual (completed) transporting under § 1324(a)(1)(A)(ii) . . . is a general intent crime.") *with United States v. Perez-Gonzalez*, 307 F.3d 443, 446 (6th Cir. 2002) (affirming conviction upon finding "sufficient evidence for a reasonable jury to conclude that [defendant] wilfully transported illegal aliens with the *specific intent* of furthering their illegal presence in the United States") (emphasis added).

The government contends that the fourth element of the crime—that the defendant act "willfully in furtherance of the alien[s'] illegal presence"—merely requires "a direct and substantial relationship between the transportation and its furtherance of the alien's presence in the United States." *United States v. Medina-Garcia*, 918 F.2d 4, 7-8 (1st Cir. 1990). This "substantial relationship" test "focuses on the effect the act of transportation has upon an alien's illegal

presence," not necessarily on the intent of the defendant. *United States v. 1982 Ford Pickup*, 873 F.2d 947, 950 (6th Cir. 1989).[7] However, the Court need not decide whether acting "willfully" in this context is akin to acting with "specific intent" because, at a minimum, the government must prove that the defendant *knew* that the passengers were illegal aliens.[8]

The government intends in part to offer circumstantial evidence as to the knowledge element, including, for example, the fact that the fourteen passengers spoke no English; that they spoke little, if at all, during the entire trip; that they collectively possessed just two pieces of luggage; that the "tour" involved essentially nonstop travel over two days and two nights; and that the drop-off locations included various parking lots in different east coast states. From that evidence, the government intends to argue, in substance, a simple syllogism: any reasonable person would have inferred from the circumstances that the passengers were illegal aliens; Santos-

---

[7] In contrast, some courts have focused expressly on the intent of the defendant in transporting the aliens, requiring that the defendant act with the specific purpose of furthering their illegal presence. *See 1982 Ford Pickup*, 873 F.2d at 951 (discussing the intent-based test).

[8] The government must prove that defendant either actually knew or recklessly disregarded the fact that the passengers were illegal aliens. This means that Santos-Buenos either must have known for a fact that the passengers were illegal aliens, or he must have known there was a high probability that they were, and must have consciously disregarded that high probability (thus preventing defendant from turning a "blind eye" to obvious signs that the passengers were illegally present). *See* 2B FEDERAL JURY PRACTICE AND INSTRUCTIONS § 61.05 (2d ed. 2005 Supp.) (Eleventh Circuit pattern criminal jury instruction for § 1324(a)(1)(A)(ii) states "To act with 'reckless disregard' means to be aware of, but consciously and carelessly ignore, facts and circumstances clearly indicating that the person transported was an alien who had entered or remained in the United States in violation of law."); *see also* Model Penal Code § 2.02(2)(c) ("A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists. . . ."). For convenience, the Court will refer to this element simply as the "knowledge" element. The same analysis applies to the extent the government alleges that defendant "recklessly disregarded" the fact that the passengers were illegal aliens, as even this formulation of the mental state requirement involves conscious recognition of a high probability of that fact.

Bueno is a reasonable person; therefore Santos-Bueno must have known that the passengers were illegal aliens.[9]

Defendant seeks to offer expert testimony in order to show, in substance, that he has limited cognitive abilities and, therefore, would not make inferences in the same way, or to the same degree, as a non-impaired person. Put another way, defendant contends that his intelligence (or reasoning ability) is lower than normal. Defendant is *not* claiming that he lacked the power to govern his conduct, or that his mental deficiencies somehow excuse his actions. *Cf. Schneider*, 111 F.3d at 203 (barring evidence "suggest[ing] that the defendant was temporarily out of his mind (even though not insane under section 17(a)) and that his crime was mitigated by his psychological condition" because "[s]uch evidence tends to reintroduce the very concepts that Congress wanted to exclude"). Nor is he claiming that he lacked the *capacity* to form the requisite *mens rea*; instead, he claims that he simply did not have the *mens rea* because he did not draw the necessary inferences.

Whether Santos-Bueno actually knew the passengers were illegally present in the United States is a question that requires an examination of his subjective state of mind. The government's case, at least in part, requires the jury to conclude that defendant necessarily made certain factual inferences using his reasoning ability. Without any evidence to the contrary, a jury would likely assume that defendant has normal cognitive abilities and would therefore be able to draw reasonable inferences from a given set of facts. Dr. Gansler would testify in substance that defendant's cognitive abilities were in fact impaired, and that defendant would therefore, as a

---

[9] The government also intends to offer the alleged admissions defendant made to law enforcement agents, which are addressed in the next section.

general matter, have more difficulty drawing reasonable inferences from his surroundings than would an average person. Evidence that his reasoning ability is impaired is thus relevant and is not offered to show an inability to control his impulses or to make reflective decisions. It therefore does not implicate the prohibitions of IDRA.

The Court turns next to whether the evidence is admissible under the Federal Rules of Evidence.

### 2. Rule 702 and the *Daubert* Standard

The admissibility of expert testimony is governed by Fed. R. Evid. 702. That rule provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Rule 702 codifies the *Daubert* line of cases, under which the trial court performs a gatekeeping function in regulating the admissibility of expert testimony. *United States v. Diaz*, 300 F.3d 66, 73 (1st Cir. 2002) (citing *Daubert*, 509 U.S. at 589-95; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 147-49 (1999)). This gatekeeping function requires a preliminary evaluation of both the reliability and the relevance of the proffered expert testimony. *Id*. In the context of scientific evidence, review for reliability requires the trial court to determine "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93; *Diaz*, 300 F.3d at 73. Regarding relevancy, "expert testimony must be

relevant not only in the sense that all evidence must be relevant, but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue." *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998) (citation omitted).

The Rule 702 inquiry "is a flexible one, and there is no particular procedure that the trial court is required to follow in executing its gatekeeping function under *Daubert*." *Diaz*, 300 F.3d at 74 (citation and internal quotation marks omitted). Moreover, the court enjoys "substantial discretion" in deciding whether to admit or exclude relevant expert testimony. *Mitchell v. United States*, 141 F.3d 8, 15 (1st Cir. 1998) (citing *General Electric Co. v. Joiner*, 522 U.S. 136 (1997)).

For the reasons discussed above, evidence of defendant's cognitive ability is relevant to the knowledge element of the charged offense. The proffered evidence of defendant's cognitive abilities would therefore assist the jury in determining whether the defendant did, in fact, draw the relevant inferences as alleged by the government.[10]

The government does not appear to challenge seriously the scientific reliability of the evidence as it relates to defendant's cognitive ability. Nor does the government challenge the qualifications of Dr. Gansler to test that ability and render an opinion on it.[11] The gravamen of the government's motion is that the evidence is irrelevant to what it contends is a general intent crime

---

[10] The parties agree that Rule 704(b) bars Dr. Gansler from presenting his opinion as to whether defendant actually knew (or recklessly disregard) the fact that the passengers were illegal aliens.

[11] Even in the absence of such an objection, the court must still conduct a preliminary assessment of the expert's qualifications and the reliability of the evidence. *See Hoult v. Hoult*, 57 F.3d 1, 4-5 (1st Cir. 1995).

(i.e., the evidence is precluded by IDRA), and that its probative value—to the extent any exists—is substantially outweighed by its potential to mislead or otherwise confuse the jury.

In any event, having reviewed Dr. Gansler's curriculum vitae, including his educational background, experience, certifications, and publishing history, the Court concludes that he appears to be qualified to testify as an expert regarding defendant's cognitive abilities and the psychological or cognitive conditions that may have resulted from defendant's injury.

The Court also finds that the reasoning and methodology applied by Dr. Gansler in drawing conclusions about defendant's cognitive abilities appear to be reliable. Dr. Gansler administered a battery of standardized psychological tests, including those that comprise the Weschler Adult Intelligence Scale-III (WAIS-III).[12] The Weschler Scale—now in its third revision—is currently the most widely administered comprehensive adult intelligence test. Daniel W. Shuman, PSYCHIATRIC AND PSYCHOLOGICAL EVIDENCE § 2.15, at 2-24.1 (rev. 2d ed. 2004 Supp.); *see also Atkins v. Virginia*, 536 U.S. 304, 309 n.5 (2002) (noting the WAIS-III is the "standard instrument in the United States for assessing intellectual functioning"). Although obviously no test of intellectual ability is infallible, the reliability of WAIS-III as a tool for assessing cognitive function is not seriously disputed in this case. Moreover, nothing in the record indicates that the test was improperly administered. Regarding the other standardized tests administered by Dr. Gansler, the Court concludes, at least in the absence of any evidence to the contrary, that the tests as administered were sufficiently reliable in measuring the attributes of

---

[12] As noted in Dr. Gansler's report, all eleven subscales of the test were administered, but only ten were used in calculating defendant's full-scale IQ, in order to "minimize the effects of cultural bias." According to Dr. Gansler, one subscale involved "a task that is very specific to attendance of primary school education in the United States," and as a result, defendant, whose six years of schooling were in Mexico, achieved his lowest performance on that particular subscale.

cognition that they purport to measure.

Accordingly, the Court will not exclude the proffered testimony as to defendant's cognitive abilities under Rule 702 and the *Daubert* standard.

### 3. Rule 403 Balancing

Under Fed. R. Evid. 403, relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." The government contends that Dr. Gansler's testimony "could improperly suggest that some form of the abolished diminished capacity defense is available to the defense or that the defendant would be entitled to sympathy and possible nullification." The government's concern is not without foundation. *See, e.g., Cameron*, 907 F.2d at 1067 (noting that psychiatric evidence "presents an inherent danger that it will distract the jury[] from focusing on the actual presence or absence of *mens rea*, and . . . may easily slide into wider usage that opens up the jury to theories of defense more akin to justification") (internal quotation marks omitted). In the present case, however, the Court can mitigate the potential prejudicial impact of Dr. Gansler's testimony by carefully limiting the scope of that testimony and properly instructing the jury on the nature and limitations of expert testimony. *See Schneider*, 57 F.3d at 134 n.6 (limitations on scope of expert psychological testimony can prevent impermissible jury inferences).

As previously noted, Dr. Gansler's testimony as to defendant's cognitive ability is relevant to whether defendant drew the factual inferences necessary to conclude that his passengers were illegal aliens, and therefore to the knowledge element of the offense. However, defendant's alleged difficulty in exercising judgment, his impaired ability to appreciate the consequences of his actions, and his impaired ability to "execut[e] appropriate plans of action" are not relevant, or at

least not directly relevant, to the knowledge element. Moreover, these conclusions come dangerously close to the kinds of psychological exculpatory defenses which the IDRA was designed to preclude. As such, the court will limit Dr. Gansler's testimony to the issue of defendant's cognitive function and his ability to draw inferences. The Court will also instruct the jury as appropriate to minimize the risk of confusion or unfair prejudice.

### B. Evidence Concerning Defendant's Vulnerability to Suggestion

#### 1. Insanity Defense Reform Act

Defendant also intends to use Dr. Gansler's testimony to attack the accuracy and reliability of his statements to the agents. Here, defendant is not addressing his mental state at the time of the crime, but rather his mental state at the time of his purported admissions. Thus he is neither attempting to directly negate the requisite *mens rea*, nor attempting to mount an affirmative defense to his alleged conduct**;** he is, in contrast, questioning the reliability of statement he made *after* the alleged offense. In this context, the IDRA is inapposite, and "[i]t is well established that a witness' mental state can be relevant to the issue of the witness' credibility." *United States v. Gonzolez-Maldonado*, 115 F.3d 9, 15 (1st Cir. 1997). In *United States v. Shay*, 57 F.3d 126 (1st Cir. 1995), the First Circuit determined that psychological evidence regarding a defendant's character for truthfulness may be admissible to attack defendant's inculpatory, out-of-court statements to law enforcement authorities. Thus, there is certainly no categorical bar on psychological evidence pertaining to witness credibility. That evidence, however, must satisfy the requirements of Rules 702 and 403. *Id.* at 132-34.

### 2. Rule 702 and the *Daubert* Standard

The Court has grave concerns about both the scientific reliability and the relevance of Dr. Gansler's statement that "[i]ndividuals with [the] type of dysfunction [exhibited by Santos-Bueno] are known to be vulnerable to suggestion." Although this statement may be true, its foundation is far from clear. The report does not state the source of this claim, or whether it is a well-recognized condition in the mental health field. Is the conclusion based on scientific or academic literature? Is it a condition that has a name, and defining characteristics, such as might be found in a manual of differential diagnostics? Is it based on anecdotal evidence, or simply common sense? The report does not say. Moreover, unlike the clear link between cognitive abilities and inferential reasoning, the link between "suggestibility" and defendant's cognitive limitations is not immediately obvious. In addition, the probative value of the conclusion is limited by the fact that Dr. Gansler has provided no indication of whether Santos-Bueno *himself* is vulnerable to suggestion. For instance, there is no indication that Dr. Gansler conducted any type of test regarding defendant's personal susceptibility to suggestion—indeed, the Court is unaware whether such a test exists. Thus, there is a layer of speculation not present in the testimony regarding defendant's cognitive abilities.

At the December 22, 2005 hearing on this motion, defendant asserted that Dr. Gansler's conclusion as to suggestibility was based on the science of neuropsychology and his professional experience, and requested an opportunity to provide the Court with a scientific basis for that opinion. Notwithstanding the Court's concerns, defendant will be permitted an opportunity to supplement the record in that respect. The timing of that supplementation, if any, will be addressed at the upcoming status conference on January 13, 2006.

### C. Government Examination of Defendant

Under Fed. R. Crim. P. 12.2(c)(1)(B), the Court may, upon the government's motion, "order the defendant to be examined under procedures ordered by the court." The government has so moved, and the Court, in the interests of justice and to permit an opportunity for effective rebuttal, will order defendant to be examined by a government psychologist.

At the December 22, 2005 hearing, the Court ordered the government to provide defense counsel with a proposed plan for its examination by January 6, 2006. Issues that arise concerning the scope and content of the examination, and the ability of defense counsel to observe the examination, will be addressed at the status conference scheduled for January 13.

## III. Conclusion

For the foregoing reasons, the government's motion in limine to exclude expert testimony is DENIED in part, in that the defendant will be permitted to put on expert testimony concerning his limited cognitive abilities. The remainder of the government's motion will remain under advisement pending further supplementation of the record, if any, by the defendant. The government's motion for an examination under Fed. R. Crim. P. 12.2(c)(1)(B) is GRANTED, under procedures to be determined at the status conference on January 13, 2006.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: January 5, 2006